**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**DEVIN G. NUNES,**

                    **Plaintiff,**

        **v.**                                              **Civil No.:  3:19-CV-00889**

**CABLE NEWS NETWORK, INC.,**

                    **Defendants.**

**MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION TO DISMISS**

WILLIAMS & CONNOLLY LLP

Dane H. Butswinkas (VSB No. 30562)
Kevin T. Baine (*pro hac vice*)
Stephen J. Fuzesi (*pro hac vice*)

725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
kbaine@wc.com

*Attorneys for Cable News Network, Inc.*

# **TABLE OF CONTENTS**

INTRODUCTION ...........................................................................................................................1

BACKGROUND ...........................................................................................................................2

      A.     Representative Nunes.................................................................................................2

      B.     Impeachment Proceedings. ......................................................................................3

      C.     The CNN Publications at Issue.................................................................................5

      D.     This Lawsuit..............................................................................................................6

LEGAL STANDARD....................................................................................................................7

ARGUMENT ................................................................................................................................7

I.     THE AMENDED COMPLAINT SHOULD BE DISMISSED BECAUSE REP.
      NUNES FAILED TO COMPLY WITH THE RETRACTION STATUTE.......................7

      A.     The Case is Governed by the Law of Rep. Nunes's Home State,
             California. .................................................................................................................7

      B.     Rep. Nunes Failed To Comply with the California Retraction Statute.................13

             1.     The Statute Applies to CNN's Publications at Issue Here.........................14

             2.     Rep. Nunes Did Not Comply with the Statute. ..........................................15

      C.     The Amended Complaint Fails Plausibly To Allege Special Damages. ..............17

II.    THE AMENDED COMPLAINT FAILS TO PLAUSIBLY ALLEGE A CLAIM
      OF CONSPIRACY. ........................................................................................................19

CONCLUSION............................................................................................................................21

## **TABLE OF AUTHORITIES**

### **CASES**

*Adventure Outdoors, Inc. v. Bloomberg*, 2007 WL 9735875 (N.D. Ga. Dec. 18, 2007) ...................................................................................................9, 10, 12, 13

*Anderson v. Hearst Publ'g Co.*, 120 F. Supp. 850 (S.D. Cal. 1954) .................................16, 17, 19

*Anschutz Entm't Grp. v. Snepp*, 90 Cal. Rptr. 3d 133 (Ct. App. 2009) ................................. *passim*

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454 (Cal 1994) (In Bank)............................................................................................................19

*Ascend Health Corp. v. Wells*, 2013 WL 1010589 (E.D.N.C. Mar. 14, 2013).............9, 10, 12, 13

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..............................................................................2, 7, 20

*Bay Tobacco, LLC v. Bell Quality Tobacco Prods., LLC*, 261 F. Supp. 2d 483 (E.D. Va. 2003).....................................................................................................21

*Bell Atl. v. Twombly*, 550 U.S. 544 (2007) ...............................................................................20

*Childers v. San Jose Mercury Printing & Publ'g Co.*, 38 P. 903 (1894) ......................................18

*Cockrum v. Donald J. Trump for President, Inc.*, 365 F. Supp. 3d 652 (E.D. Va. 2019) ......................................................................................................................11, 12

*Cox v. MAG Mutual Ins. Co.*, 2015 WL 1640513 (E.D. Va. Apr. 9, 2015) ..........................20, 21

*FAA v. Cooper*, 566 U.S. 284 (2012)........................................................................................18

*Farr v. Bramblett*, 281 P.2d 372 (Cal. Dist. Ct. App. 1955) ...................................................16, 17

*Fellows v. Nat'l Enquirer, Inc.*, 721 P.2d 97 (Cal. 1986) (In Bank) ............................................17

*Field Research Corp. v. Superior Court of S.F.*, 453 P.2d 747 (Cal. 1969)................................16

*Galustian v. Peter*, 561 F. Supp. 2d 559 (E.D. Va. 2008), *reversed in part on other grounds*, 591 F.3d 724 (4th Cir. 2010)............................................................8

*Gilmore v. Jones*, 370 F. Supp. 3d 630 (E.D. Va. 2019) ....................................................... *passim*

*Gomes v. Fried*, 186 Cal. Rptr. 605 (Ct. App. 1982)...........................................................1, 17, 18

*Grillo v. Smith*, 193 Cal. Rptr. 414 (Ct. App. 1983)..................................................................18

*Hall v. Virginia*, 385 F.3d 421 (4th Cir. 2004) ..........................................................................3

*Harper v. Lugbauer*, 2011 WL 6329870 (N.D. Cal. Nov. 29, 2011) ............................................20

*Harris v. Curtis Publ'g Co.*, 121 P.2d 761, 769 (Cal. Dist. Ct. App. 1942)..................................16

*Hatfill v. Foster*, 415 F. Supp. 2d 353 (S.D.N.Y. 2006)...................................................8, 9, 12, 13

*Homeland Housewares, LLC v. Euro-Pro Operating LLC*, 2014 WL 6892141
    (C.D. Cal. Nov. 5, 2014).........................................................................................................18

*Horace Mann Ins. v. Gen. Star Nat'l Ins.*, 514 F.3d 327 (4th Cir. 2008)....................................7,8

*Hudson Assocs. Consulting, Inc. v. Weidner*, 2010 WL 1980291 (D. Kan. May 18,
    2010) .......................................................................................................................................12

*In re Cable News Network*, 106 F. Supp. 2d 1000 (N.D. Cal. 2000)................................15, 17, 19

*Jones v. R.S. Jones & Assocs.*, 431 S.E.2d 33, 34 (Va. 1993) .......................................................12

*Kalpoe v. Superior Court*, 166 Cal. Rptr. 3d 80 (Ct. App. 2013) ...........................................15, 19

*King v. Am. Broad. Cos.*, 1998 WL 665141 (S.D.N.Y. Sept. 28, 1998)............................... *passim*

*Kylin Network (Beijing) Movie & Culture Media Co. v. Fidlow*, 2017 WL
    2385343 (E.D. Va. June 1, 2017)......................................................................................8, 21

*Lawrence-Leiter & Co. v. Paulson*, 963 F. Supp. 1061 (D. Kan. 1997)......................................13

*Martin v. Wells Fargo Bank*, 2018 WL 6333688 (C.D. Cal. Jan. 18, 2018) ...............................18

*Martinez v. Rodriguez*, 1995 WL 864098 (Cal. Super. Ct. Aug. 2, 1995) .........................1, 14, 17

*McMillan v. McMillan*, 219 Va. 1127 (1979) ..........................................................................8, 10

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250 (4th Cir. 2009)......................7

*Nunes v. Twitter*, 2019 WL 5549825 (Va. Cir. Ct. Oct. 2, 2019) .................................................12

*O'Hara v. Storer Comm'ns, Inc.*, 282 Cal. Rptr. 712 (Ct. App. 1991).................................. *passim*

*Quillen v. Int'l Playtex, Inc.*, 789 F.2d 1041 (4th Cir. 1986).....................................................7, 8

*Seaman v. IAC/InteractiveCorp., Inc.*, 2019 WL 1474392 (E.D. Va. Apr. 3, 2019).......................2

*Velocity Micro, Inc. v. J.A.Z. Mktg.*, 2012 WL 3017870 (E.D. Va. July 23, 2012).......................11

*Virdis Dev. Corp. v. Bd. of Supervisors of Chesterfield Cty.*, 92 F. Supp. 3d 418
    (E.D. Va. 2015)..........................................................................................................................3

*Wells v. Liddy*, 186 F.3d 505 (4th Cir. 1999)....................................................................8, 10, 11

*Wiest v. E-Fense, Inc.*, 356 F. Supp. 2d 604, 608 (E.D. Va. 2005) ................................................11

*X-Tra Art, Inc. v. Consumer Union*, 48 F.3d 1230, 1995 WL 100613 (9th Cir. 1995) ........................................................................................................................19

## STATUTES AND RULES

Cal. Civ. Code § 48a ............................................................................................ *passim*

Fed. R. Civ. P. 9 ...........................................................................................1, 7, 18, 19

Va. Code Ann. § 18.2-499 (West) ...............................................................................20

## OTHER AUTHORITIES

6A Cal. Jur. 3d Assault and Other Willful Torts § 240 ................................................16

House Perm. Select Comm. on Intel., *The Trump-Ukraine Impeachment Inquiry Report*, H.R. Doc. No. 116-335 (2019)..........................................................3, 6

Restatement (First) of Conflict of Laws § 377 (1934)...................................................8

## INTRODUCTION

California Congressman Devin Nunes, the ranking member of the House Intelligence Committee, brought this libel and "conspiracy" suit against Cable News Network, Inc. ("CNN") based on its report that a witness was prepared to testify that Rep. Nunes had met with Ukrainian prosecutor Victor Shokin to discuss "digging up dirt" on Joe Biden. CNN spoke with the witness's lawyer, Joseph Bondy, on the record, and Mr. Bondy was quoted extensively in the report. CNN also noted that it had made multiple attempts to seek comment from Rep. Nunes prior to reporting this story, but that he and his staff had declined to comment on whether Rep. Nunes had met with Mr. Shokin. CNN's reporting of what Mr. Bondy said on the record, as a lawyer, was truthful and accurate.

Instead of denying the report before it was published, Rep. Nunes waited until it appeared and then filed this suit seeking more than $435 million in damages—labeling CNN "the mother of fake news." Compl. ¶ 1. In his rush to sue, however, Rep. Nunes overlooked the need first to request a retraction. California, the state where Rep. Nunes resides and whose law governs this case, requires a defamation plaintiff to serve "an unequivocal demand for correction or retraction" in writing within 20 days of learning of an allegedly defamatory report. *See Martinez v. Rodriguez*, 1995 WL 864098, at *2 (Cal. Super. Ct. Aug. 2, 1995); *O'Hara v. Storer Comm'ns, Inc*., 282 Cal. Rptr. 712, 717-18 (Ct. App. 1991); Cal. Civ. Code § 48a. Failure to serve a timely demand for retraction limits the plaintiff to "special damages"—that is, actual "economic loss." *Gomes v. Fried*, 186 Cal. Rptr. 605, 614 (Ct. App. 1982). Because the Complaint failed to plead special damages with the specificity that is required, *see* Fed. R Civ. P. 9(g), CNN moved to dismiss.

Rather than opposing CNN's motion to dismiss, Rep. Nunes filed an Amended Complaint. But the Amended Complaint only underscores why dismissal is required. In his amended pleading, Rep. Nunes again does not—because he cannot—plead compliance with California's retraction

statute.  And, despite being on direct notice of his failure to plead special damages, Rep. Nunes does not add any allegations concerning special damages at all—let alone with the specificity that is required.  Because Rep. Nunes has now had the opportunity to amend, his Complaint should be dismissed with prejudice.  *See, e.g.*, *King v. Am. Broad. Cos.*, 1998 WL 665141, at *3 (S.D.N.Y. Sept. 28, 1998); *Anschutz Entm't Grp. v. Snepp*, 90 Cal. Rptr. 3d 133, 165 (Ct. App. 2009).

In addition, the conspiracy claim is independently defective and must be dismissed for the further reason that it is based on nothing more than conclusory allegations that cannot give rise to a plausible claim.  *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Again, despite being on notice of the failure to properly allege this claim in his original complaint, Rep. Nunes did nothing in his Amended Complaint to save it.  For this reason, again, the Amended Complaint should be dismissed with prejudice.[1]

## BACKGROUND

A.    **Representative Nunes.**

Rep. Nunes was born and raised in California.  Am. Compl. ¶ 7.  He has served as a California Representative in the United States House of Representatives since 2003 and currently represents "California's 22nd Congressional District, which is located in the San Joaquin Valley and includes portions of Tulare and Fresno Counties."  *Id.*  He is now, by his own account, a "prominent" Republican congressman, who serves as the Ranking Member on the House Intelligence Committee.  *Id.* ¶ 5.  He was previously the Committee Chairman during the 114th and 115th Congresses.  *Id.* ¶ 7.

---

[1] Simultaneous with its original Motion to Dismiss, CNN filed a Motion to Transfer the case to the Southern District of New York because it simply has nothing to do with the Eastern District of Virginia.  The Court may wish to consider that motion before ruling on this Motion to Dismiss. *See Seaman v. IAC/InteractiveCorp., Inc.*, 2019 WL 1474392, at *8 (E.D. Va. Apr. 3, 2019) (granting transfer motion to Southern District of New York, noting that the transferee court would decide a pending motion to dismiss).

Rep. Nunes is a frequent defamation litigant. He and his counsel brought at least four different defamation cases in Virginia courts in the last year alone.[2]

### B. Impeachment Proceedings.

The publications at issue here were part of CNN's coverage of the House of Representatives' impeachment inquiry, which concerned among other questions whether President Trump had improperly sought assistance from Ukraine to benefit his reelection efforts. The House investigation began in earnest in September 2019 and was led primarily by the House Intelligence Committee.[3] As the Ranking Member on that Committee, Rep. Nunes had substantial involvement in the proceedings; he asserts in his Amended Complaint that he "spearheaded Republican efforts to investigate and defend the truth during the impeachment inquiry." Am. Compl. ¶ 51(k).

Early in the investigation—and long before CNN's publications at issue here—it was widely reported that a key point of focus in the impeachment investigation was the effort of President Trump's personal attorney, Rudy Giuliani, to press the Ukrainian government to investigate Vice President Biden.[4] It also was widely reported that Mr. Giuliani had been working

---

[2] *See Nunes v. McClatchy Co. et al.*, No. CL-19-629 (Va. Cir. Ct. Albemarle Cty.); *Nunes v. Twitter, Inc. et al.*, No. CL-19-1715 (Va. Cir. Ct. Henrico Cty.); *Nunes v. Fusion GPS A/K/A Bean LLC*, No. 19-cv-01148 (E.D. Va.). This case is the fourth.

[3] *See* House Perm. Select Comm. on Intel., *The Trump-Ukraine Impeachment Inquiry Report*, H.R. Doc. No. 116-335, at 7 (2019), https://intelligence.house.gov/uploadedfiles/20191203_-_full_report___hpsci_impeachment_inquiry_-_20191203.pdf ("House Report"). The Court may take judicial notice of publicly available government documents. *See, e.g.*, *Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004). Likewise, the Court may take judicial notice of "newspaper articles attached to the motion to dismiss when the articles discuss the subject matter of the case," *Gilmore v. Jones*, 370 F. Supp. 3d 630, 669 (E.D. Va. 2019) (quotation marks omitted), as well as websites referenced in a complaint, *see, e.g.*, *Virdis Dev. Corp. v. Bd. of Supervisors of Chesterfield Cty.*, 92 F. Supp. 3d 418, 421 n.4 (E.D. Va. 2015).

[4] *See, e.g.*, Letter from Adam B. Schiff, Chairman House Perm. Select Comm. on Intel., et al. to Rudolph W. L. Giuliani (Sept. 30, 2019), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/documents/20190930%20-%20Giuliani%20HPSCI%20Subpoena%20Letter.pdf; Nicholas Fandos, *House Subpoenas*

with various associates on these efforts, including Florida-based businessmen Lev Parnas and Igor Fruman. *See, e.g.*, Am. Compl. ¶ 22.[5]  In October, Messrs. Parnas and Fruman were indicted in the Southern District of New York on campaign finance charges.  *See* Ex. A; Am. Compl. ¶ 12. Mr. Parnas has been represented in that proceeding by two criminal attorneys, Joseph Bondy and Ed MacMahon.  *Id.*

Shortly after the indictment, Mr. Parnas received a Congressional subpoena to provide documents and testimony as part of the impeachment investigation.[6]  Mr. Parnas's attorneys publicly stated that he was "willing to comply with a Congressional subpoena for documents and testimony as part of the impeachment inquiry in a manner that would allow him to protect his Fifth Amendment rights against self-incrimination."  Ex. A.

On November 20, 2019, The Daily Beast published an online article, *Lev Parnas Helped Rep. Devin Nunes' Investigations*, reporting that Mr. Parnas had "helped arrange meetings and calls in Europe for Rep. Devin Nunes in 2018."  The article attributed the information to "Parnas' lawyer Ed MacMahon."  *Id.*[7]  The Daily Beast's reporting gained widespread attention.  Rep. Eric

---

*Giuliani, Trump's Lawyer, for Ukraine Records*, N.Y. Times (Sept. 30, 2019), https://www.nytimes.com/2019/09/30/us/politics/impeach-giuliani-subpoena.html.

[5] Paragraph 22 of the Amended Complaint cites and links to an October 10, 2019 Washington Post article reporting on the arrest of Messrs. Parnas and Fruman, explaining that "[t]he two men, Lev Parnas and Igor Fruman . . . had been helping Giuliani investigate Democratic presidential candidate and former vice president Joe Biden."  Devlin Barrett, John Wagner, and Rosalind S. Helderman, *Two business associates of Trump's personal attorney Giuliani have been arrested on campaign finance charges*, Wash. Post (Oct. 10, 2019), https://www.washingtonpost.com/politics/two-business-associates-of-trumps-personal-lawyer-giuliani-have-been-arrested-and-are-in-custody/2019/10/10/9f9c101a-eb63-11e9-9306-47cb0324fd44_story.html.

[6] Barrett, et. al, cited in Am. Compl. ¶ 22; *see also* Letter from Adam B. Schiff, Chairman House Perm. Select Comm. on Intel., et al. to John M.  Dowd (Oct. 10, 2019), https://intelligence.house.gov/uploadedfiles/2019-10-09.eec_engel_schiff_to_parnas_fruman_re_subpoena.pdf.

[7] Betsy Swan, *Lev Parnas Helped Rep. Devin Nunes' Investigations*, Daily Beast (Nov. 20, 2019), https://www.thedailybeast.com/lev-parnas-helped-rep-devin-nunes-investigations.

Swalwell introduced the report during the House Intelligence Committee's impeachment hearing the very same day it was published.[8]

### C.   The CNN Publications at Issue.

On November 22, 2019, CNN published its online report, *Exclusive:  Giuliani associate willing to tell Congress Nunes met with ex-Ukrainian official to get dirt on Biden*.  Am. Compl. ¶ 34.[9]  The article reported that Mr. Bondy, Parnas's attorney, told CNN that Mr. Parnas was prepared to testify that Rep. Nunes met "with a former Ukrainian prosecutor to discuss digging up dirt on Joe Biden."  Ex. A.  The report extensively quoted Mr. Bondy, who spoke to CNN on the record, stating among other things: "Mr. Parnas learned from former Ukrainian Prosecutor General Victor Shokin that Nunes had met with Shokin in Vienna last December" in 2018.  *See id.*

The CNN report, authored by senior reporter Vicky Ward,[10] cited government travel records showing that Rep. Nunes traveled to Europe along with several aides from November 30 to December 3, 2018, when he was said to be meeting with Mr. Shokin.  *Id.*  The article also linked to the Daily Beast article and explained that Rep. Swalwell had discussed the Daily Beast story in the impeachment hearing on November 21, 2019.  The CNN report noted that Rep. Nunes and his staff had declined comment on multiple occasions, including after that hearing.  *Id.*

Following publication of the online report, Ms. Ward appeared on CNN's evening television program *Cuomo Prime Time*, where she and anchor Chris Cuomo discussed the story.

---

[8] *See* House Perm. Select Comm. on Intel. Impeachment Inquiry, Tr. 146:9-21 (Nov. 21, 2019), https://www.congress.gov/event/116th-congress/house-event/110235?s=1&r=3.

[9]   A   copy   of   the   article   is   attached   as   Ex.   A   and   is   available   at https://www.cnn.com/2019/11/22/politics/nunes-vienna-trip-ukrainian-prosecutor-biden/index.html.

[10] Ms. Ward is based in New York, as noted in the biography hyperlinked to the article.  *See* https://www.cnn.com/profiles/vicky-ward#about.   Three other CNN reporters, based out of Washington D.C., were noted as contributors to the report.  *See* Ex. A.

Am. Compl. ¶ 37.[11]  Ms. Ward emphasized again that Mr. Parnas had been subpoenaed in the impeachment inquiry, and that Mr. Bondy was hoping to negotiate terms that would allow Mr. Parnas to testify freely.  Ex. B; Ex. C.  Ms. Ward also described CNN's efforts to seek comment from Rep. Nunes.  *Id.*  At the end of the segment, Mr. Cuomo called on Rep. Nunes to respond to the allegations.  *Id.*  Subsequently, after Rep. Nunes was quoted disputing CNN's report in an article published on the Breitbart website, CNN updated its online report to include his denial.  *See* Ex. A.

### D.    This Lawsuit.

Rep. Nunes does not allege that he ever served CNN with a written request for a retraction that could satisfy his obligations under the California retraction statute, and in fact, Rep. Nunes sent no such retraction request to CNN.  Rather, on December 3, 2019, Rep. Nunes filed his lawsuit against CNN, asserting claims for defamation and conspiracy.  And on February 7, 2020, he filed his Amended Complaint, re-asserting the same claims.  Am. Comp. ¶¶ 46-57.

Rep. Nunes principally claims that the CNN publications defamed him by reporting the allegation that he had met with Ukrainian prosecutor Victor Shokin in Vienna to discuss digging up dirt on Joe Biden.  Am. Compl. ¶ 2.  The Amended Complaint continues to seek more than $435 million in damages, Am. Compl. at 1, but it does not allege any special damages or claim that Rep. Nunes suffered any specific pecuniary loss.[12]

---

[11] A video of the telecast is attached as Ex. B.  A transcript of the telecast is attached as Ex. C.

[12] Notably, however, Rep. Nunes does not dispute that he and his staffer, Derek Harvey, have been in contact with Mr. Parnas by phone.  In fact, the same day Rep. Nunes filed his lawsuit, the House Intelligence Committee published its Trump-Ukraine Impeachment Inquiry Report, which showed numerous calls between Mr. Parnas and Rep. Nunes and Mr. Harvey.  House Report, at 46, 157-58.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quotation marks omitted). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do," nor will "naked assertion[s] devoid of further factual enhancement." *Id.* (quotation marks omitted). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* (quotation marks omitted). Rather, there must be "well-pleaded factual allegations." *Id.* at 679. And "the complaint's factual allegations must produce an inference of liability strong enough to nudge the plaintiff's claims across the line from conceivable to plausible." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 256 (4th Cir. 2009) (quotation marks omitted). In addition, if special damages are claimed, they "must be specifically stated." Fed. R. Civ. P. 9(g).

## ARGUMENT

### I.    THE AMENDED COMPLAINT SHOULD BE DISMISSED BECAUSE REP. NUNES FAILED TO COMPLY WITH THE RETRACTION STATUTE.

Rep. Nunes's claims are barred by the California retraction statute, Cal. Civ. Code § 48a. Rep. Nunes does not, and cannot, allege that he complied with that statute, and he has failed to specifically plead the special damages to which he is limited as a result.

#### A.    The Case is Governed by the Law of Rep. Nunes's Home State, California.

A federal district court sitting in diversity applies the conflicts rule of the forum state to determine which state's law will govern the action. *Quillen v. Int'l Playtex, Inc.*, 789 F.2d 1041, 1044 (4th Cir. 1986). If the forum state's law is unsettled, then the district court must "predict how the state's highest court would rule on [the] unsettled issue." *Horace Mann Ins. v. Gen. Star*

*Nat'l Ins.*, 514 F.3d 327, 329 (4th Cir. 2008).  Here the best prediction is that the law of Rep. Nunes's home state, California, would apply.

The Virginia Supreme Court "has consistently held that it is the place of the wrong (lex loci delicti) that determines which State's substantive law applies in a tort action brought in Virginia."  *Quillen*, 789 F.2d at 1044 (citing *McMillan v. McMillan*, 219 Va. 1127 (1979)). Generally speaking, that is "the place where the last event necessary to make an act liable for an alleged tort takes place."  *Id.* (quotation marks omitted).  For defamation claims, that has been historically understood to be "where the defamatory statement is communicated" to a third-party. Restatement (First) of Conflict of Laws § 377 n.5 (1934).[13]  But that understanding provides little guidance where, as here, a communication is published to third-parties simultaneously in 50 states. As the Fourth Circuit recognized in a case involving Maryland law and a nationally syndicated radio show, "application of the traditional lex loci delicti rule becomes cumbersome, if not completely impractical" in multistate defamation cases involving the simultaneous publication of statements across different jurisdictions.  *Wells v. Liddy*, 186 F.3d 505, 527 (4th Cir. 1999).

"The Supreme Court of Virginia has yet to address how the 'place of the wrong' should be defined in 'situations where the defamatory content is published in multiple jurisdictions.'" *Gilmore v. Jones*, 370 F. Supp. 3d 630, 645 (W.D. Va. 2019) (quoting *Kylin Network (Beijing) Movie & Culture Media Co. v. Fidlow*, 2017 WL 2385343, at *3, n.2 (E.D. Va. June 1, 2017)).[14] For that reason, this Court must predict what law the Virginia Supreme Court would likely apply

---

[13] For example, "[w]ith respect to defamation claims involving email, the place of publication is deemed to be the place where the email was received (i.e., opened and read)."  *Galustian v. Peter*, 561 F. Supp. 2d 559, 565 (E.D. Va. 2008), *reversed in part on other grounds*, 591 F.3d 724 (4th Cir. 2010).

[14] *See also, e.g.*, *Galustian*, 561 F. Supp. 2d at 565 ("The Virginia courts have yet to address the *lex loci* rule in the context of multistate defamation by means of mass communication."); *Hatfill v. Foster*, 415 F. Supp. 2d 353, 364 (S.D.N.Y. 2006) (similar).

in this multi-jurisdiction defamation suit, in which the Amended Complaint recognizes that CNN's reports aired online and on television across the nation.[15]

The prevailing view, adopted by multiple federal courts, is that the Virginia Supreme Court would apply the law of the state of the plaintiff's injury, which is generally plaintiff's domicile (in this case, California).  *See, e.g.*, *Hatfill v. Foster*, 415 F. Supp. 2d 353, 365 (S.D.N.Y. 2006).  For example, in a recent multi-state Internet defamation case, the U.S. District Court for the Western District of Virginia concluded that the Virginia Supreme Court would apply the law of "the state where the plaintiff is primarily injured as a result of the allegedly tortious online content." *Gilmore*, 370 F. Supp. 3d at 666.  Thus, while the publication at issue was available worldwide through the Internet, the court held that the "state where the plaintiff [was] primarily injured" was Virginia, where he lived and worked.  *Id.*  Likewise, applying Virginia choice-of-law principles, a district court in the Southern District of New York reached the same conclusion in another defamation action involving a nationwide magazine publication.  *See Hatfill*, 415 F. Supp. 2d at 365.  In that case, the court held Virginia would apply the law of the state "where the plaintiff suffered the greatest injury," which is "where the plaintiff was domiciled, absent strong countervailing circumstances."  *Id.* at 364-65 (explaining that this is how the "vast majority" of lex loci jurisdictions resolve the issue); *see also Ascend Health Corp. v. Wells*, 2013 WL 1010589, at *2 (E.D.N.C. Mar. 14, 2013) (applying the similar lex loci rule of North Carolina and holding that the site of plaintiffs' injury would control in multistate Internet defamation case); *Adventure*

_____

[15] *See, e.g.*, Am. Compl. ¶ 8 ("CNN claims that it reaches more individuals on television, the web and mobile devices than any other cable television news organization in the United States."), ¶ 38 ("CNN coordinated publication of the false and defamatory statements about Plaintiff across each of its platforms. CNN published the CNN Article to multiple new target audiences, including CNN's 32,000,000+ Facebook followers and CNN's 56,000,000+ Twitter followers in Virginia and around the World. . . .  CNN's goal was to inflict maximum damage to Plaintiff's reputation Worldwide and to cause him to be removed from the impeachment inquiry.").

*Outdoors, Inc. v. Bloomberg*, 2007 WL 9735875, at *3 (N.D. Ga. Dec. 18, 2007) (same, applying the lex loci rule of Georgia).

There are three reasons why this is the correct result. First, applying the place of injury is most consistent with "the underlying rationale" of the lex loci rule, which the Virginia Supreme Court has held to be "uniformity, predictability, and ease of application." *Gilmore*, 370 F. Supp. 3d at 664 (quoting *McMillan*, 253 S.E.2d at 665). "The traditional *lex loci delicti* rule 'presumes that the defamatory statement is published (*i.e.*, communicated to third parties) in one geographic location,' but publication via the Internet results in instantaneous 'multistate (if not[] worldwide) publication.'" *Id.* (alteration in original) (quoting *Ascend Health Corp.*, 2013 WL 1010589, at *2). The same is true, of course, for a nationwide telecast. As a result, "defining the 'place of the wrong' as the place of publication in cases like this"—with reports airing online and across the nation and even frequently involving contributions from journalists in multiple jurisdictions[16]— "would inevitably require the cumbersome application of a patchwork of state law," which is neither uniform nor predictable. *Id.*; *see also, e.g.*, *Wells*, 186 F.3d at 528 ("multistate defamation is a tort for which the *lex loci delicti* rule fails to reach a satisfactory result"). In short, it would be unreasonable to assume that the Virginia Supreme Court would adopt an interpretation that defeats what it has held to be the very purpose of the rule.

Second, "defining the 'place of the wrong' as the place of publication in a case like this raises thorny questions about the nature of online publication"—and publication via national telecast—and specifically about where the "publication" (that is, "where [the] content is communicated to third parties") technically occurs. *Gilmore*, 370 F. Supp. 3d at 665. Courts are

---

[16] In this case, for instance, the online report at issue was authored by Ward in New York, but was contributed to by CNN journalists in Washington, D.C. The coverage then appeared across the country, via television and online.

increasingly at odds and "unclear whether 'publication' of online content occurs in the state where an individual uploads content, the state where the relevant media platform or publication maintains headquarters, the state where a website's servers are located, or the state where third parties actually view the content (which, absent restrictions on the geographic reach of a particular online publication, will be in all fifty states and across the world)." *Id.* This has led to inconsistent results even within this district. *See, e.g.*, *id.* (citing several cases, including *Wiest v. E-Fense, Inc.*, 356 F. Supp. 2d 604, 608 (E.D. Va. 2005) (place of publication is "corporate headquarters" of company controlling website); *Velocity Micro, Inc. v. J.A.Z. Mktg.*, 2012 WL 3017870, at *6 (E.D. Va. July 23, 2012) (place of publication is the "place where the [allegedly defamatory] email was opened and read")).

Third, further underscoring how "completely impractical" the application of the traditional rule would be in a multi-state defamation case, *see Wells*, 186 F.3d at 527, these questions often go beyond the scope of information included in a complaint. For example, in some cases courts have been forced to assume where the publication occurred. *See, e.g.*, *Velocity*, 2012 WL 3017870, at *6 (assuming that email to Minnesota corporation was opened and therefore published in Minnesota). In other cases, courts have applied Virginia law by default because the answer appeared unknowable. *See, e.g.*, *Cockrum v. Donald J. Trump for President, Inc.*, 365 F. Supp. 3d 652, 670 (E.D. Va. 2019) (applying Virginia law where "[a]gents of WikiLeaks could have posted the DNC's information from countless locations around the world" such that the court could not "determine where the act of publication occurred based on the Amended Complaint"). In such situations, the lex loci goals of "uniformity" and "predictability" are plainly not achieved.

While in an invasion of privacy context the *Cockrum* court predicted last year—prior to *Gilmore*—that the Supreme Court of Virginia would define the "place of the wrong" to be "the

place where the act of publication to the Internet occurred," 365 F. Supp. 3d at 669-70, that interpretation conflicts with how the "vast majority" of lex loci jurisdictions have resolved the question, *Hatfill*, 415 F. Supp. 2d at 364, and is wrong for each of the reasons discussed above. It is further premised on the incorrect proposition that looking to the site of injury would run afoul of the Virginia Supreme Court's prior rejection of the Second Restatement's "most significant relationship" test for choice of law. *See Cockrum*, 365 F. Supp. 3d at 669 (citing the wrongful death case of *Jones v. R.S. Jones & Assocs.*, 431 S.E.2d 33, 34 (Va. 1993)). The *Gilmore* court explained why this supposed conflict was illusory: "[t]he Court <u>does not</u> hold that the Supreme Court of Virginia would apply the Second Restatement's 'most significant relationship' test, which provides that defamation cases should be decided under the law of the state with "the most significant relationship to the occurrence and the parties." 370 F. Supp. 3d at 665 n.37 (emphasis added). Instead, *Gilmore* applied "another variant of *lex loci delicti* that defines the 'place of the wrong' as the site of the plaintiff's injury.'" *Id.* As *Gilmore* makes clear, the tests are different; the "most significant relationship" test looks to the "most significant relationship <u>to the occurrence and the parties</u>," whereas the lex loci injury test looks <u>to the plaintiff's injury</u>. *See id.* (emphasis added). Other jurisdictions similarly reject the "most significant relationship" test and apply a lex loci rule that looks to the site of the plaintiff's injury. *Ascend Health Corp.*, 2013 WL 1010589, at *2 (North Carolina); *Adventure Outdoors*, 2007 WL 9735875, at *3 (Georgia); *Hudson Assocs. Consulting, Inc. v. Weidner*, 2010 WL 1980291, at *6 (D. Kan. May 18, 2010) (Kansas).[17]

---

[17] To the extent the trial court in *Nunes v. Twitter* applied *Cockrum* and suggested that the law of the "place of publication" to the Internet should apply, its brief analysis is unpersuasive for the same reasons that *Cockrum*'s analysis is unpersuasive. 2019 WL 5549825, at *2 (Va. Cir. Ct. Oct. 2, 2019). Moreover, the court was not even undertaking a choice of law analysis, but rather determining whether the cause of action arose "outside of Virginia" for purposes of *forum non conveniens*. The complaint alleged that the defendants were Virginia residents who had published the social media posts at issue in Virginia. *Id.* at *1-2. And, while the court noted that it was

In short, the best prediction of what the Virginia Supreme Court would hold is the one recently reaffirmed in *Gilmore*: defining "the place of the wrong" in a case like this as the state where "the plaintiff is injured." *Gilmore*, 370 F. Supp. 3d at 664; *Hatfill*, 415 F. Supp. 2d at 365. This approach is the most consistent with "underlying values animating the Supreme Court of Virginia's approach to *lex loci delicti*." *Gilmore*, 370 F. Supp. 3d at 666.

Once that determination is made, the rest of the choice of law analysis is indisputable. Rep. Nunes alleges that he is a "citizen of California." Am. Compl. ¶ 7. California, therefore, is presumptively the location of the greatest part of any alleged injury. *See, e.g.*, *Hatfill*, 415 F. Supp. 2d at 365 (district where plaintiff was domiciled is presumptively the place of greatest harm); *Ascend Health Corp.*, 2013 WL 1010589, at *2; *Adventure Outdoors, Inc.*, 2007 WL 9735875, at *3 (citing *Hatfill* and explaining that the "place of greatest harm is where plaintiff domiciled"); *Lawrence-Leiter & Co. v. Paulson*, 963 F. Supp. 1061, 1065 (D. Kan. 1997) (applying law of "plaintiff's domicile"). Accordingly, California law applies.

## B.   Rep. Nunes Failed To Comply with the California Retraction Statute.

Rep. Nunes failed to comply with California's retraction statute. Cal. Civ. Code § 48a. As a result, he is limited to seeking special damages.

Pursuant to the statute, "[i]n any action for damages for the publication of a libel in a daily or weekly news publication, or of a slander by radio broadcast," a defamation plaintiff "shall only recover special damages unless a correction is demanded and is not published or broadcast as provided" by the statute. *Id.* Specifically, a plaintiff must "serve upon the publisher at the place of publication, or broadcaster at the place of broadcast, a written notice specifying the statements

---

rejecting a "significant relationship" rule, it apparently did not consider the separate place of injury test adopted in *Gilmore*. *Id.* The court did not mention *Gilmore* or the other cases cited here that are consistent with *Gilmore*.

claimed to be libelous and demanding that those statements be corrected." *Id.* The "notice and demand must be served within 20 days after knowledge of the publication or broadcast of the statements claimed to be libelous." *Id.* The communication must "specifically demand a retraction or correction," and must be "unequivocal." *Martinez v. Rodriguez*, 1995 WL 864098, at *2 (Cal. Super. Ct. Aug. 2, 1995); *O'Hara v. Storer Commc'ns*, 282 Cal. Rptr. 712, 718 (Ct. App. 1992) (demand cannot be "conditional").

"Whether [Plaintiff] met the requirements of the statute is a question of law." *See, e.g.*, *O'Hara*, 282 Cal. Rptr. at 717. California law is clear that in the event a plaintiff fails to comply with the statute—and, indeed, plead compliance—the "individual cannot recover anything beyond 'special damages.'" *See, e.g.*, *Anschutz Entm't Grp. v. Snepp*, 90 Cal. Rptr. 3d 133, 163 (Ct. App. 2009).

The retraction statute has teeth by design. California adopted the statute "to encourage a more active press by means of an increased insulation of [the press] from liability arising from erroneous published statements." *Id.* at 163 (quotation marks omitted). It "represents a significant change from common law libel," and was part of a broader legislative trend "to restrict perceived excessive general damage awards and protect the public interest in the free dissemination of news." *Id.* (quotation marks omitted).

## 1.    The Statute Applies to CNN's Publications at Issue Here.

As a threshold matter, it is indisputable that the retraction statute covers CNN's online article and telecast at issue here. First, the statute was expanded in 2015 to expressly cover online news reports. *See* Cal. Civ. Code § 48a (including within the scope of the statute "a publication, either in print <u>or electronic form</u>, that contains news on matters of public concern and that publishes at least once a week") (emphasis added). Second, "[i]t is clear" that the statute applies to television

14

broadcasts. *See, e.g.*, *King v. Am. Broad. Cos.*, 1998 WL 665141, at *2 (S.D.N.Y. Sept. 28, 1998) (citing *O'Hara*, 282 Cal. Rptr. at 712); *Kalpoe v. Superior Court*, 166 Cal. Rptr. 3d 80, 88 (Ct. App. 2013) ("The language of the statute clearly applies to all types of television shows."); *see also, e.g.*, *In re Cable News Network*, 106 F. Supp. 2d 1000, 1001 (N.D. Cal. 2000) (statute applies to claims concerning CNN news telecasts).

### 2. Rep. Nunes Did Not Comply with the Statute.

Rep. Nunes does not—and cannot—allege compliance with the statute. The Amended Complaint does not plead that he ever made any specific written retraction demand meeting the statutory requirements, much less within "20 days" as required by the statute's plain terms. Cal. Civ. Code § 48a.

Even after being put on notice of this fundamental defect in his original complaint through CNN's initial motion to dismiss, Rep. Nunes did not correct it in his Amended Complaint— because he cannot. Rep. Nunes never made any applicable written demand to CNN seeking retraction within the allotted time period. In his Amended Complaint, Rep. Nunes adds a vague assertion that "Plaintiff repeatedly notified CNN of the falsity of its statements and demanded retraction." Am. Compl. ¶ 51(o); *id*. at ¶ 45. But this is clearly insufficient. He never pleads compliance with the retraction statute—in particular, its strict requirements that the retraction demand be (1) "a written notice specifying the statements claimed to be libelous and demanding that those statements be corrected"; (2) "served within 20 days after knowledge of the publication or broadcast of the statements; and (3) "serve[d] upon the publisher at the place of publication, or broadcaster at the place of broadcast." Cal. Civ. Code § 48a. There was no such demand.

Courts enforce the "plain language of the statute," and have made clear that failure to adhere to its precise requirements is fatal to a claim. *See, e.g.*, *King*, 1998 WL 665141, at *3-4

(dismissing complaint that failed to allege demand had been made in writing); *Anderson v. Hearst Publ'g Co.*, 120 F. Supp. 850, 853-54 (S.D. Cal. 1954) (dismissing complaint in which demand did not identify specific statements to be retracted, emphasizing that "[w]e cannot disregard the plain language of the California statute, Section 48a, Civil Code, that the plaintiff shall serve a written notice specifying the statements claimed to be libelous" (quotation marks omitted)); *see also, e.g.*, *Anschutz*, 90 Cal. Rptr. at 165 (demand that failed to identify plaintiff was insufficient); *O'Hara*, 282 Cal. Rptr. at 718 ("conditional" retraction request was insufficient); *Farr v. Bramblett*, 281 P.2d 372, 377 (Cal. Dist. Ct. App. 1955) (letter inviting publisher to meeting to make retraction was insufficient), *disapproved of on other grounds by Field Research Corp. v. Superior Court of S.F.*, 453 P.2d 747 (Cal. 1969).

Further, that Rep. Nunes filed his Complaint within 20 days of publication does not satisfy his obligations under the plain terms of the retraction statute. The law requires a demand that precedes and is distinct from the complaint. Indeed, a plaintiff clearly cannot satisfy the statutory requirement to "<u>plead</u> . . . notice, demand and failure to correct" if a demand was never made prior to suit. Cal. Civ. Code § 48a (emphasis added). Moreover, the statute allows a publisher "three weeks" <u>after</u> receiving the demand to make a correction. *Id.* And, of course, the demand must be for a <u>retraction</u>—not, as in the Complaint, for "compensatory damages and punitive damages in an amount not less than $435,350,000." Am. Compl. p. 1; *see Harris v. Curtis Publ'g Co.*, 121 P.2d 761, 769 (Cal. Dist. Ct. App. 1942) (demand insufficient where it made clear that "nothing less than financial compensation would be accepted"); 6A Cal. Jur. 3d Assault and Other Willful Torts § 240 (same). The retraction statute provisions allow a publisher a fair opportunity to determine whether to make a correction <u>before</u> engaging in litigation. This is why, in *Farr*, the

court held that "no demand in accordance with sec. 48a was made," even though the Plaintiff had filed its complaint within two days of publication. 281 P.2d at 377.[18]

### C.   The Amended Complaint Fails Plausibly To Allege Special Damages.

Because Rep. Nunes failed to comply with the retraction statute, he "shall only recover special damages." Cal. Civ. Code § 48a. Accordingly, "without an allegation of special damages, the complaint does not allege a legally sufficient cause of action, and it must be dismissed." *King*, 1998 WL 665141, at *4 (dismissing complaint).

Courts routinely dismiss complaints where, as here, the plaintiff has not complied with the retraction statute and has not alleged special damages with the requisite specificity. *See, e.g.*, *id.*; *Anderson*, 120 F. Supp. at 853-54 (dismissing complaint); *In re Cable News Network*, 106 F. Supp. 2d at 1001-02 (dismissing claims for failure to "allege special damages with adequate specificity" where plaintiffs had "not alleged a sufficient demand for retraction"); *Anschutz*, 90 Cal. Rptr. 3d at 165 (granting Anti-SLAPP motion based on "insufficient pleading of a special damages claim" where plaintiff "never served a legally effective retraction demand"); *Fellows v. Nat'l Enquirer, Inc.*, 721 P.2d 97, 101 (Cal. 1986) (In Bank) (explaining that where a plaintiff's "complaint sought only general damages and did not allege that he had demanded a retraction, the [retraction] statute would have clearly barred a libel action").

Rep. Nunes's Amended Complaint does not come close to alleging special damages, let alone with the requisite specificity. Whereas "general damages encompass the loss of reputation, shame and mortification and hurt feelings in any context, including the plaintiff's trade or

---

[18] Likewise, in *O'Hara*, the court held that a letter demanding a discussion with counsel regarding a retraction was insufficient because it was conditional. *See* 282 Cal. Rptr. at 718 (applying *Farr*). And, in *Martinez v. Rodriguez*, the court held that a letter putting the defendant on notice of plaintiff's legal alternatives was insufficient because it was not an "unequivocal demand" for a retraction. 1995 WL 864098, at *2 (citing *O'Hara*).

business," "special damages are defined narrowly to encompass only economic loss." *Gomes v. Fried*, 186 Cal. Rptr. 605, 614 (Ct. App. 1982) (emphasis added and citations omitted); *see also Childers v. San Jose Mercury Printing & Publ'g Co.*, 38 P. 903, 904 (1894) ("Special damages, as a branch of actual damages, may be recovered when actual pecuniary loss has been sustained.") (emphasis added). Indeed, "[p]roof of special damages by defamed public officials is close to impossible." *Grillo v. Smith*, 193 Cal. Rptr. 414, 417 n.2 (Ct. App. 1983) (emphasis added). In addition, any alleged special damages must be pleaded with specificity. *See, e.g.*, Fed. R. Civ. P. 9(g) (special damages must be "specifically stated"); *FAA v. Cooper*, 566 U.S. 284, 295 (2012) ("'Special damages' are limited to actual pecuniary loss, which must be specially pleaded and proved.").

Simply repeating the same assertions in his original Complaint, Rep. Nunes makes only a generic allegation that he "suffered presumed damages and actual damages, including, but not limited to, insult, pain, embarrassment, humiliation, mental suffering, injury to his reputation, special damages, costs, and other out-of-pocket expenses, in the sum of $435,000,000 or such greater amount as is determined by the Jury." Am. Compl. ¶¶ 52, 57. While the Amended Complaint literally says the words "special damages," it fails to allege any specific economic loss, much less an "estimation of the amount of pecuniary loss suffered" "with the requisite particularity." *Martin v. Wells Fargo Bank*, 2018 WL 6333688, at *2 (C.D. Cal. Jan. 18, 2018); *see also, e.g.*, *Homeland Housewares, LLC v. Euro-Pro Operating LLC*, 2014 WL 6892141, at *4 (C.D. Cal. Nov. 5, 2014) ("Plaintiffs' general statements of economic loss and bare statement for relief of $3 million dollars in damages do not sufficiently identify special damages."); *Anschutz*, 90 Cal. Rptr. 3d at 165 (general allegations of damage to plaintiff's reputation was "insufficient to

meet the specific pleading requirement" for special damages following failure to demand retraction); Fed. R. Civ. P. 9(g).

Because the Amended Complaint lacks an adequate allegation of special damages, it "does not allege a legally sufficient cause of action under California law," and must be dismissed. *King*, 1998 WL 665141, at *4; *In re Cable News Network*, 106 F. Supp. 2d at 1001-02; *Anderson*, 120 F. Supp. at 853-54.

## II.    THE AMENDED COMPLAINT FAILS TO PLAUSIBLY ALLEGE A CLAIM OF CONSPIRACY.

The conspiracy claim must be dismissed along with the underlying defamation claim for the same reasons.  "Conspiracy is not an independent tort. . . .  It allows tort recovery only against a party who already owes the duty and is not immune from liability based on applicable substantive tort law principles." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454, 459 (Cal 1994) (In Bank).[19]  The retraction statute thus bars the conspiracy claim, just as it bars the defamation claim: "[w]here the complaint is based on an offensive statement that is defamatory, plaintiffs have not been allowed to circumvent the statutory limitation[s] by proceeding on a theory other than defamation."  *X-Tra Art, Inc. v. Consumer Union*, 48 F.3d 1230 (table), 1995 WL 100613, at *3 (9th Cir. 1995) (citing cases) (quotation marks omitted); *see also, e.g.*, *Kalpoe*, 166 Cal. Rptr. 3d at 81, 87-88 (where plaintiff failed to request a retraction, limiting plaintiff's recovery to special damages for all claims, including conspiracy).  The California retraction statute bars Plaintiff's defamation claim, and he cannot plead around that with a conspiracy claim arising out of the same statements.

---

[19] For the reasons described in Section I.A, *supra,* California law should apply to the claims here.

19

Even apart from the retraction statute, the conspiracy allegations fail for the independent reason that they are nothing more than "naked assertions devoid of factual enhancement" that do not state a claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (brackets and quotation marks omitted). "Under California law, a claim of civil conspiracy has three elements: (1) an agreement to commit wrongful acts; (2) commission of the wrongful acts; and (3) damage resulting from commission of the wrongful acts." *Harper v. Lugbauer*, 2011 WL 6329870, at *5 (N.D. Cal. Nov. 29, 2011). Here there is no plausible allegation that CNN entered into an agreement with Mr. Parnas and his attorneys to commit wrongful acts against Rep. Nunes. *See, e.g.*, *id.* ("Nowhere in the Complaint does Plaintiff allege that Defendants Coyle and Page actually entered into any agreement to commit wrongful acts."); *Cox v. MAG Mutual Ins. Co.*, 2015 WL 1640513, at *6 (E.D. Va. Apr. 9, 2015) (dismissing conspiracy claim where complaint "neither identifies nor details any sort of agreement between the defendants"). This is textbook *Twombly*: "Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Bell Atl. v. Twombly*, 550 U.S. 544, 556-57 (2007).

The closest the Amended Complaint comes to alleging an agreement is the generic allegation that CNN "combined, associated, agreed or acted in concert with Parnas and his attorneys." Am. Compl. ¶ 54. But this is nothing more than parroted language from Virginia's conspiracy statute. *See* Va. Code Ann. § 18.2-499 (West) ("Any two or more persons who combine, associate, agree, mutually undertake or concert together . . . ."); *compare Iqbal*, 556 U.S. at 678 ("A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." (quotation marks omitted)).

Such threadbare allegations will not suffice.  Indeed, at least three courts in this District have dismissed similar conspiracy claims brought by Rep. Nunes's counsel on precisely these grounds.  *See Bay Tobacco, LLC v. Bell Quality Tobacco Prods., LLC*, 261 F. Supp. 2d 483, 498-99 (E.D. Va. 2003) (allegation that co-conspirators "combined, associated, agreed or acted in concert" to put plaintiff out of business "is woefully inadequate" and "fails to allege a number of the required elements of conspiracy" (quotation marks omitted)); *Cox*, 2015 WL 1640513, at *6 (allegation that alleged co-conspirators "combined, associated, agreed or acted in concert together for the purposes of willfully and maliciously injuring [plaintiff] in his business and property" is "vague" and "insufficient to state a claim" (quotation marks omitted)); *Kylin Network (Beijing) Movie & Culture Media Co. Ltd v. Fidlow*, 2017 WL 2385343, at *4 (E.D. Va. June 1, 2017) (dismissing conspiracy counterclaim where counter-plaintiff "does not allege the requisite concert of action and unity of purpose in more than mere conclusory language" (quotation marks omitted)).  So too here.  The conspiracy claim is implausible and must be dismissed.

## **CONCLUSION**

For the foregoing reasons, the Amended Complaint should be dismissed with prejudice.


Dated:  February 21, 2020                Respectfully submitted,

                                         WILLIAMS & CONNOLLY LLP

                                         By:    /s/ *Dane H. Butswinkas*

                                         Dane H. Butswinkas (VSB No. 30562)
                                         Kevin T. Baine (*pro hac vice*)
                                         Stephen J. Fuzesi (*pro hac vice*)

                                         725 Twelfth Street, N.W.
                                         Washington, DC 20005
                                         Telephone: (202) 434-5000
                                         Facsimile: (202) 434-5029

kbaine@wc.com

*Attorneys for Cable News Network, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 21st day of February 2020, I caused a true and correct copy of the foregoing Memorandum of Law in Support of the Motion to Dismiss of Defendant Cable News Network, Inc. to be served on counsel of record via the Court's CM/ECF system.

/s/ *Dane H. Butswinkas*

Dane H. Butswinkas